## Sholl Brothers, Defendants in Error, v. Peoria & Pekin Union Railway Company, Plaintiff in Error.

### Gen. No. 6,075.

1.   EVIDENCE, § 351*—*when evidence admissible to ascertain intent of parties to contract.* Evidence of the construction placed on a written contract by the parties, when competent, is a valuable aid in ascertaining the intention of such parties, but when competent its use

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

Mullen v. Johnson, 196 Ill. App. 303.

is limited to ascertaining such intention, and such evidence cannot be used to force a new and different meaning into the contract.

2. CONTRACTS, § 187*—*when construction by parties adopted.* Where the terms of an agreement are in any respect doubtful or uncertain, if the parties thereto have by their own conduct placed thereon a reasonable construction, the courts will adopt such construction in litigation concerning it.

3. EVIDENCE, § 351*—*when evidence not admissible in aid of construction of contract.* Where a contract is clear and unambiguous and there is no doubt as to the identity of the subject-matter to which it relates, no extrinsic evidence is competent in aid of construction.

4. EVIDENCE, § 156*—*when statement of attorney at trial admission of uncertainty of contract.* In an action involving the construction of a written contract, a statement of counsel that it is the duty of the court in construing the contract to look to facts *dehors* the contract in order to ascertain the intention of the parties, and the necessity for such a statement, is a virtual admission that there is uncertainty in the language of such contract as to require external aid to ascertain its meaning.

5. CONTRACTS, § 8*—*when contract not clear and unambiguous.* In a bill to enforce a contract whereby plaintiff contracted with defendant railroad company to construct and operate on plaintiff's land a branch track from its main line to plaintiff's coal mine, defendant to have the right to use such track for all purposes and to serve all industries "or for the purpose of making connections with any other industries except *coal mine*" which might thereafter be located in the vicinity reached by such track, contract *held* not clear and unambiguous in that it admitted of conflicting constructions equally plausible and depending in each case on the consideration of extrinsic circumstances.

6. CONTRACTS, § 188*—*when construction placed by parties on ambiguous contract controlling.* In a bill to· enforce an ambiguous contract whereby plaintiff contracted with defendant railroad company to construct and operate on plaintiff's land a branch track to its coal mine, wherein defendant was permitted the use of the track for all purposes except "coal mine," the fact that the parties had for some time placed a construction thereon which precluded defendant from transporting over such track in either direction any coal not mined by plaintiff, *held* to control in determining the meaning of the contract.

7. INJUNCTION, § 245*—*when may be violated with impunity with consent of party procuring.* Where only private interests are concerned, neither contracts of parties nor judgments nor decrees of

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

courts stand in the way of any action taken by and with the consent of all parties interested, so that where an injunction has been granted restraining the transportation of certain coal over a railroad, no danger need be apprehended by the party restrained if in the future it transports such coal with the consent of the party procuring the injunction, although by such transportation such injunction may be technically violated.

8. RAILROADS, § 355*—*when contract limiting use of railroad track void.* Where a particular railroad track in question is a part of a public railroad, any contract limiting the public use thereof is void.

9. RAILROADS, § 194*—*when contracts for switch tracks over private property valid.* Owners of private property may contract with railroad corporations for switch tracks to be laid over their own private property without submitting such tracks to burdens imposed on the main lines of such railroads.

10. RAILROADS, § 194*—*when no right to regulate private railroads under Constitution.* Section 12 of article XI, of the Constitution, declaring that public railroads are public highways and providing that they shall be free to all persons for the transportation of their persons and property thereon under such regulations as may be prescribed by law, applies only to railroads constructed for public use, and only such are intended to be regulated thereby, the Constitution having no reference to railroads constructed for private use.

11. RAILROADS, § 194*—*when private railroad may become subject to constitutional provisions.* Although a railroad may be originally constructed for private use and not within the regulation of section 12, article XI, of the Constitution, regulating public railroads, yet where the contract under which it was constructed provides for other uses and where the use of such private railroad is from time to time extended by connections so as to make other and further use of it, it is a fair question whether in such extended operation it has not become part of a public highway, and within the regulation of the Constitution as part of a public railroad.

12. RAILROADS, § 194*—*what constitutes a private railroad.* In a bill to enforce a contract whereby plaintiff contracted with defendant, a railroad company, to construct and operate a branch track from its main line to plaintiff's coal mine, in which contract defendant had the right to use such track for all railroad purposes except a named purpose, *held* that such branch track was a railroad constructed for private use, and hence not within the regulation of section 12, article XI of the Constitution, regulating public railroads.

13. RAILROADS, § 196*—*when agreement for construction of private*

*See Illinois Notes Digest, Vols. XI to XV, and Cumulative Quarterly, same topic and section number.

*track valid as against State.* A contract whereby an owner of a coal mine contracts with a railroad for the construction and operation on plaintiff's land of a branch track from its main line to plaintiff's coal mine, wherein defendant has the right to use such track for all railroad purposes other than "coal mine," is not in violation of any public right, although a State institution in the vicinity has no other railroad connection, and thereby suffers a hardship in that such railroad cannot transport to it any coal other than that mined by such owner, since the State is in no other or better position, as to its property, than other owners of property similarly situated.

Error to the Circuit Court of Peoria county; the Hon. JOHN M. NIEHAUS, Judge, presiding. Heard in this court at the April term, 1915. Affirmed. Opinion filed October 20, 1915.

FRANK T. MILLER, for plaintiff in error; STEVENS, MILLER & ELLIOTT, of counsel.

FRANK J. QUINN, for defendant in error; QUINN & QUINN, CHARLES V. O'HERN and JOHN DOUGHERTY, of counsel.

PATRICK J. LUCEY, Attorney General, filed a brief in behalf of the State *amicus curiae;* LESTER H. STRAWN, Assistant Attorney General, of counsel.

MR. JUSTICE CARNES delivered the opinion of the court.

Scholl Brothers, the defendants in error, filed a bill to enjoin the Peoria & Pekin Union Railway Company, the plaintiff in error, from moving on or over a certain track any coal or coal mine products not mined on lands of the complainants. The defendants answered the bill and the cause was submitted to the master in chancery to take evidence and report his conclusions of law and fact, which he did, recommending that the injunction issue. Objections and exceptions to the master's report were duly entered, argued and overruled, and a decree of injunction entered substantially as prayed in the bill, and the defendant railway company brings the case here on writ of error.

The facts as stated in the brief of the plaintiff in error are admitted by the defendants in error sub-

stantially correct in all the main features of the case, and are substantially as follows:

Sholl Brothers were the owners in fee simple of certain surface and coal lands in or near South Bartonville, Illinois, a town or village, lying between Peoria and Pekin, Illinois. These coal lands lie on a high ridge, approximately one hundred and fifty feet above a valley, through which, parallel with the Illinois River, is one of the main lines of the Peoria & Pekin Union Railway Company.

In 1896 the defendants in error sought to develop this mining property, and sunk a shaft at the top of this ridge, which became known as "Sholl Mine No. 3" or "Prosperity Mine." The Peoria & Pekin Union Railway Company at that time had the only railroad running near these lands. In order to get railway connections with the shaft and mine, the defendant in error induced the plaintiff in error to enter into a written contract under which a switch was laid in 1896, and from that time up to the present this switch has served this mine.

This proceeding involved the construction of that contract, which is as follows:

> "ARTICLES OF AGREEMENT made this 16th day of July, A. D. 1896, by and between the PEORIA & PEKIN UNION RAILWAY COMPANY, a Corporation of the State of Illinois, party of the first part, and Jas. M. Sholl, Henry S. Sholl and Samuel V. Sholl, doing business under the name and style of SHOLL BROTHERS, parties of the second part.
>
> "WITNESSETH: That said party of the first part will put in a side track and side track facilities for said second parties from its main track to a coal mine near Bartonville, Illinois,—which mine is to be operated by said second parties and is about to be opened by them,—upon the following terms and conditions:

Second District—October, 1915.     311

Sholl Bros. v. Peoria & Pekin Union Ry. Co., 196 Ill. App. 306.

b.  "The said second parties shall furnish the right-of-way, grade and bridge the same, from the main track of said first party to said mine, and do all grading and bridging necessary for tracks at the Mine, free of all cost to said first party, and shall also pay to said first party, the sum of Three Hundred Dollars ($300.00) as their proportion of the first cost of ties to be used in constructing said side track.

c.  "Upon condition that said second parties comply with the foregoing agreements and conditions, said first party agrees to furnish the balance of ties and other material necessary, including rails, laying the track from its main track to the Mine and the necessary Mine tracks, and to maintain such track at its own expense.

d  "In consideration of so doing, said first party is to have, at all times, exclusive use of said tracks and right-of-way. It shall also have the right to use said right-of-way and tracks in handling the business of, or for the purpose of making connections with, any other industry except coal mine, that may hereafter be located adjacent to said right-of-way or reached from said right-of-way, provided said first party shall always do such other business in a manner which will not interfere with the business of said second parties.

e.  "In consideration of the premises, said second parties agree to ship their Mine output that shall be shipped by rail, or the product of any other industry which they may hereafter locate on or near the line of said right-of-way, over the rails of said first party, at equal rate. All rates to be determined hereafter in the usual manner of fixing rates for such business.

"This contract shall extend to and be binding for a period of twenty-five (25) years from the date hereof, and thereafter until either party gives

f.    sixty (60) days' notice of its desire to terminate said contract, upon said first party, its successors and assigns, and upon second parties, their heirs, administrators and assigns.

"IN WITNESS whereof, etc." (We have for purposes of reference, indicated by letters the different clauses of the contract.)

This track so arranged for was completed during the year 1896, each of the parties thereto contributing in accordance with the provisions of the contract. Clause d requires construction and occasions this dispute. There was no other industry upon that hill at the time, nor so far as the parties contracting them knew, was there one in contemplation. An Illinois state asylum site had been chosen and lay just beyond the Sholls' land, but there were no buildings and none had as yet been provided for.

In addition to the coal lands that the defendants in error then owned, and were obtaining options on, there were several thousand acres of other coal land in near proximity and on the same hill, and the only way to get to a railroad from this coal field would have been over that switch. In other words, the defendant in error had purchased the right-of-way for the only switch track that could be laid in this neighborhood and reach this coal field.

Some time after the construction of this track, buildings were constructed upon the site of the asylum grounds, and during that period of construction much building material was delivered over the Sholl switch which was extended to the hospital site by the Peoria & Pekin Union Railway Company under a special agreement with the State authorities. The asylum was opened for business and commenced to receive patients in February, 1902.

The delivery of coal to this asylum is the cause of this controversy. Complainants claim that under the contract no coal can be transported over this track

except such as comes from their mine, while the defendant claims that the contract permits it to transport coal to the asylum coming from outside mines.

It seems that from a period between 1902 and 1912 Sholl Brothers had the contract to furnish the coal at the asylum. It also is in evidence that other coal dealers sought to get the contract to furnish this coal but could never get the contract because of the claim on the part of Sholl Brothers that the railway company was not permitted to haul coal over that track other than coal coming from their own mine; that on several occasions attempts were made by other coal dealers to induce the defendant company to transport coal over that track to the asylum, but without success, as it, through its management, held out to the public that it could not accept coal from delivery over this track unless it came from Sholls' mine. There were times, however, when Sholl Brothers, because of breakdowns at their mine, were unable to deliver the coal to the asylum, and at such times they filled their contract with the State institution by procuring coal at other mines; and then especially requested the railway company to deliver coal from such other mines to the asylum. It is claimed now by defendants in error that this course of conduct operated as a practical construction of the contract and that plaintiff in error is bound by such construction.

In 1912 there was for the first time an insistent effort made to induce the management of the plaintiff in error to accept coal for delivery over this switch to the asylum from mines other than Sholl Brothers, so that the State institution, through its proper channel, could advertise for bids for its coal supply. The contract in question was then submitted to the counsel of the plaintiff in error, who advised the management that it did not have the right to refuse to transport coal over that switch from other mines, except coal coming from mines located along the right-of-way of

this switch, or reached over this switch and established after the execution of this contract. The plaintiff in error then issued a supplement to its regular tariff by which it held out to all shippers of coal (outside of the accepted field) that it would take coal for delivery over the switch in question to the insane asylum.

Afterwards in April or May, 1912, coal coming from Wolschlag mine, located on the main track of the Peoria & Pekin Railway Company, was delivered by the railway company to the asylum and against the protests of Sholl Brothers. This proceeding was then commenced.

The decree found that until December, 1911, both complainants and defendant uniformly and continuously construed the contract as preventing the delivery of coal mined at other points over the switch, and that complainant always insisted on such construction. This finding is not much controverted by plaintiff in error, but it says the questions are: "(1) Is the language of the contract clear and unambiguous, or is it uncertain, doubtful and ambiguous? (2) If the language is clear does the conduct of the parties estop them from claiming that the construction was improper and against the express language employed in the contract? (3) Are the persons or the general public other than the parties immediately contracting bound by the conduct of the contracting parties, and to the injury of the public?" and cites authorities to the effect that the practical construction by the parties to a contract is immaterial where the language employed in the contract is clear and decisive, and claims that the language in question is not ambiguous. The law, no doubt, is as stated in *Gibbs v. People's Nat. Bank*, 198 Ill. 307, that the rule of construction of contracts by the parties to them as governing the construction by the court can only be used to assist in arriving at the intention of the parties, not to force a new and different meaning into the contract, and where no ambiguity appears

in the contract and the intention is clear on the face of the instrument the rule is not applied. But if the contract is ambiguous, "no extrinsic aid can be more valuable" than "the interpretation that the parties thereto have placed thereon in its performance for assisting in ascertaining its true meaning." *Slack v. Knox*, 213 Ill. 190, and cases there cited. It is said in *People v. Murphy*, 119 Ill. 159, on page 166: "It is a familiar rule of construction, that where the terms of an agreement are in any respect doubtful or uncertain, and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the courts, in the event of litigation concerning it."

Therefore the inquiry is, Does the contract, and particularly clauses of it, clearly express the intention of the parties, or is it ambiguous, permitting the consideration of its construction by the parties, and the application of the rule?

Counsel for plaintiff in error say: "It is the duty of the court to ascertain the condition of the parties, the circumstances surrounding them, and the motives that moved them at the time of executing the contract in order to determine what their intention was." No such extrinsic consideration is permissible if the contract is clear and unambiguous. The court said in *Stettauer v. Hamlin*, 97 Ill. 312, on page 318: "It is to be observed, however, that while courts, when necessary, put themselves in possession of all the facts and circumstances connected with the execution of an instrument, for the purpose of ascertaining the intention of the parties and explaining any ambiguity arising from extrinsic facts, yet this is never done where the terms of the instrument are clear and unambiguous, and there is no doubt as to the identity of the subject-matter to which the instrument relates." This statement of counsel and the necessity that impels them to invoke the aid of surrounding circumstances to sus-

316    APPELLATE COURTS OF ILLINOIS.

Sholl Bros. v. Peoria & Pekin Union Ry. Co., 196 Ill. App. 306.

tain their construction of the contract is a virtual admission that there is such uncertainty in its language as to require external aid in ascertaining its meaning. The contention is mainly as to the construction of the following language in clause *d*: "Said party is to have, at all times, exclusive use of said tracks and right-of-way. It shall also have the right to use said right-of-way and tracks in handling the business of, or for the purpose of making connections with, any other industry except *coal mine,* that may hereafter be located adjacent to said right-of-way or reached from said right-of-way." Counsel seem to agree that notwithstanding the unqualified right granted by the first sentence, if considered alone, still that right is limited by the language of the second sentence, and that the switch cannot be used by the plaintiff in error in "handling the business of some *coal mine* industry;" but counsel for plaintiff in error say the coal mine industry excluded is one "that may hereafter be located adjacent to said right-of-way," and that "reached from" is not to be construed in the broad sense that would include any coal mine in the United States located on a railroad; that it means only any coal mine that should be located near that of defendants in error; that defendants in error were aiming to prevent competition from mines that might be located near them and therefore were contracting that coal should not be shipped *out* over that track, and were not contemplating danger from coal being shipped *in* over that track, and consequently were not guarding against that kind of shipment, and they argue with much force from a consideration of the surrounding circumstances when the contract was executed that its language should be so construed. Counsel for defendants in error argue from the circumstances surrounding the parties, with about equal plausibility, that the railroad and Sholl Brothers intended to say and did say: The Peoria & Pekin Union shall be

the only road allowed to use this switch. It can serve all classes of industries and persons, but one, now doing business adjacent to the switch, or who in the future may locate so that they may be reached from the switch, and make all necessary connections, from time to time, to render such service to all such classes. The one class not to be served is the coal producing class, and say it is absurd to suppose that defendants in error were trying to protect themselves from competition in shipping coal out and leave the railway company free to ship coal in. These conflicting constructions of the contract, each capable of plausible and reasonable support, and each requiring in its maintenance the consideration of extrinsic circumstances, leave no doubt that the terms of the contract are not clear and unambiguous, and, as we have before seen, if we are to look beyond the terms of the contract to ascertain its meaning, a very material consideration is the construction placed on it by the parties, and we are of the opinion that the proof in this case of such construction by the parties to the contract should control in determining its meaning. There is no doubt from the evidence that the parties for many years understood the contract in accordance with the conclusion reached by the chancellor, and we are of the opinion that he did not err in so construing it. Counsel argue that the decree enjoining any coal to be taken over the switch except such coal as comes from Sholls' mines is broader than the contract as construed by the parties, and therefore, although defendants in error may from time to time give consent to have other coal delivered over this track, there will be a technical violation of the injunction, and say that Sholl Brothers, or their representatives, have not the right to bind the court that entered this decree for injunction to say when or when not the injunction may be violated, and therefore the decree should have been that coal should not be delivered over this switch except from the Sholl

mines, or by the consent of Sholl. We think no danger need be apprehended from shipping coal hereafter, as heretofore, over this switch track by the consent of the complainants that procured this decree of injunction, or of the parties acquiring their interest in the matter. Where only private interests are concerned, neither the contracts of parties nor judgments or decrees of the court stand in the way of any action taken by and with the consent of all parties interested.

It is urged by plaintiff in error that the contract is in violation of its duty to serve the public. This contention is necessarily based on the assumption that the switch track in question is a part of a public railroad. Public railroads are declared public highways by section 12, art. XI of the Constitution, and it is there provided that they shall be free to all persons for the transportation of their persons and property thereon under such regulations as may be prescribed by law. Counsel cite *Louisville & N. R. Co. v. Pittsburg & K. Coal Co.*, 111 Ky. 960, which is reported in 55 L. R. A. 601, as decisive of this question. Under the circumstances of that case the track in question was held a part of the railroad as a public highway, and it necessarily followed, as it would in this case if this switch track was a part of the railroad, that a contract so limiting its use is void. Counsel for plaintiff in error say they do not wish this contract to be declared void. There can be no question that a railroad corporation cannot acquire property as a part of its public highway and make valid contracts limiting its use in violation of the constitutional provisions. But it is equally clear that the owners of private property may contract with railroad corporations for switch tracks to be laid over their own private property without submitting those tracks to burdens imposed upon the main lines of railroads. In *Koelle v. Knecht*, 99 Ill. 396, the court construed this section of the Constitution, and said it manifestly refers to railroads con-

structed for public as contradistinguished from private use; that it is only public railroads that are intended to be regulated, and held that the switch there in question was not of that character. This case has been cited and in this respect approved in *Truesdale v. Peoria Grape Sugar Co.,* 101 Ill. 561; *Chicago Dock & Canal Co. v. Garrity,* 115 Ill. 155; *Litchfield & M. Ry. Co. v. People,* 222 Ill. 242, although in those cases the rule was not applied because switches were built in the public street. Cases might arise beginning like the case at bar with a switch track laid and used on the land of a private owner for his own accommodation, extended from time to time with such connections as to make it, in its actual operation, a part of a public highway, and bring it within the provisions of the Constitution, and the fact that the contract in this case provides for other uses of the track than the service of defendants in error raises a fair question in the case whether a public highway was contemplated; but we are of the opinion that the facts in the case bring it within the rule announced in *Koelle v. Knecht, supra,* and that the provisions of the Constitution do not apply for the reasons there stated.

The Attorney General of this State has, by leave of this court, filed a brief as *amicus cureae,* in which he calls special attention to the hardship on the State in preventing the use of this switch track by parties other than Sholl Brothers of whom the State authorities may buy coal, and urges the duty of common carriers to impartially serve the public, which we have heretofore discussed. It is true that it would be in the interest of the State to have access to its institution free and open to all parties that might be inclined to supply it with coal, but we are aware of no authority that places the State in a better or different position in this respect from any private property owner that might be similarly situated and, as we have said before, we do not regard the contract as construed by

the parties to it and by the chancellor as a violation of any public right. The decree is affirmed.

*Affirmed.*

MR. JUSTICE NIEHAUS took no part.